[No. 22541. Department One. August 26, 1930.]

CITY OF TACOMA, *Appellant*, v. J. J. FOX *et al.*, *Respondents.*[1]

E. K. Murray, Bartlett Rummel, Henderson, Carnahan & Thompson, W. W. Mount, John E. Gallagher and Leo Teats, for appellant.

A. O. Burmeister and J. H. Gordon, for respondents.

TOLMAN, J.—These several cases all raise the same question, and they were consolidated for hearing in

[1] Reported in 290 Pac. 1010.

the superior court and have been consolidated for the purposes of this appeal. The several cases were originally instituted in the police court of the city of Tacoma, each charging the offense of following the trade of journeyman plumber in the city of Tacoma without first submitting to an examination and obtaining a certificate of competency as required by ordinance No. 9981, as amended by ordinance No. 10099 of the city of Tacoma.

Each of the respondents was convicted in the police court, and a small fine was assessed in each case. Appeals were taken to the superior court and the cases consolidated were there heard upon a demurrer to the complaints. The demurrer was sustained by the trial court, apparently upon the sole ground that the ordinance, in so far as, by its terms, it forbids engaging in the occupation of journeyman plumber without obtaining a certificate of competency, was invalid under the decision of this court in *State ex rel. Richey v. Smith,* 42 Wash. 237, 84 Pac. 851, 114 Am. St. 114, 7 Ann. Cas. 577, 5 L. R. A. (N. S.) 674. The city elected to stand upon the complaints and judgments of dismissal followed, from which the city has appealed.

The question involved requires a consideration of only a portion of the ordinance. After prescribing a system of specifications for the installation of plumbing, and creating the machinery for the enforcement thereof, the ordinance, in § 46, provides:

"The term 'journeyman plumber' shall be held and construed to mean and include every person engaged in, or engaging in plumbing as an artisan, or in placing, replacing, installing, constructing, or reconstructing of pipes, fittings, fixtures, or other materials connected with the business of plumbing, in any building, or elsewhere, intended for the conducting of fluids, water or sewage.

"It shall be unlawful to engage in, or to work as an

artisan at the trade of plumbing, either as a journeyman plumber or as a master plumber working in the capacity of a journeyman plumber, or to place, install, construct or reconstruct any pipe, fitting, fixture or other material connected with the business of plumbing, in any building, or elsewhere, intended for the conducting of fluids, water or sewage, without having first obtained and being the authorized holder of a valid and subsisting 'journeyman's certificate of competency.' The fee therefor shall be two dollars ($2) per annum.''

Section 47, as amended by ordinance No. 10099, creates an examining board consisting of the commissioner of public welfare, the chief plumbing inspector, the chief examiner of the civil service commission, a master plumber and a journeyman plumber; the last two to be appointed by the mayor and to serve without compensation.

Section 48 provides:

''It shall be unlawful for any person to engage in or work at the plumbing trade as an artisan, either as journeyman plumber, or as a master plumber working in the capacity of a journeyman plumber, or in or at the placing, replacing, installing, constructing or reconstructing of pipes, fittings, fixtures, or other materials connected with the business of plumbing, in any building, or elsewhere, intended for the conducting of fluids, water or sewage, without first making application to the examining board for plumbers, hereinafter provided for, and, at such time and place as said board may designate, submitting to and passing such examination as to his qualifications and competency as a journeyman plumber, as said board may prescribe. The examination shall be of such character, both practical and theoretical, as to thoroughly test the applicant's ability and competency as an artisan and journeyman plumber. A period of ninety (90) days after the effective date of this ordinance shall be allowed within which those at present engaged in such trade shall make application.''

Section 49 reads:

"The examining board for plumbers shall, within thirty (30) days after this ordinance becomes effective, meet and organize and select a chairman and designate the time and place of the first examination and shall thereupon issue a journeyman plumber's certificate of competency. Further examinations shall be held from time to time, but no applicant shall be compelled to wait more than thirty (30) days following his application. Said board shall examine each applicant as to his knowledge of plumbing, house drainage and plumbing ventilation, and if satisfied of the competency of such applicant, shall thereupon issue a journeyman plumber's certificate of competency to such applicant, authorizing him to engage in plumbing as an artisan, and to place, replace, install, construct or reconstruct, pipes, fittings, fixtures, or other materials connected with the business of plumbing, in any building, or elsewhere, intended for the conducting of fluids, water or sewage.

"Temporary working permit may be issued by the plumbing inspector until such time as the examining board meets and completes examinations. The board shall keep and preserve a record of all persons examined by them and to whom such certificate of competency has been issued."

Section 50 provides that all applicants for a certificate shall have had three years' experience as a helper or apprentice or must be a graduate of a recognized trade school which gives at least a two years' course. Section 53 contains the usual declaration of separability and consequently the question of the validity of § 50 is not involved in this proceeding, since, even if it be eliminated, a complete and workable act remains.

In substance, therefore, this ordinance prohibits engaging in the trade or occupation of a journeyman plumber by anyone who has not first established before the examining board that he is competent to follow the trade. There is not here involved

any question of arbitrary or capricious action on the part of the board, nor is it claimed that the ordinance attempts to vest in the examining board arbitrary powers.

The *Richey* case, *supra,* was decided more than twenty-four years ago, when legislation of this character was in its infancy, but it has never in terms been overruled. The opinion in that case opens with a recognition of the power of the legislature to enact all needful rules and regulations for the preservation of the health, comfort, and well-being of society. It reviews our previous cases which are anywise in point, reviews decisions from other jurisdictions, quotes extensively from a dissenting opinion in a New York case and from two other cases in the United States supreme court and then delivers the holding of the court in the following language:

"We cannot close our eyes to the fact that legislation of this kind is on the increase. Like begets like, and every legislative session brings forth some new act in the interest of some new trade or occupation. The doctor, the lawyer, the druggist, the dentist, the barber, the horseshoer, and the plumber have already received favorable consideration at the hands of our legislature, and the end is not yet, for the nurse and the undertaker are knocking at the door. It will not do to say that any occupation which may remotely affect the public health is subject to this kind of regulation and control. Our health, our comfort, and our well-being are materially affected by all of our surroundings—by the houses we live in, the clothes we wear, and the food we eat. The safety of the traveling public depends in no small degree on the skill and capacity of the section crews that build and repair our railroads; yet are we on this account to add the architect, the carpenter, the tailor, the shoemaker, those who produce and prepare our food, and all the rest, to the ever growing list? If so, it will be but a short time before a man cannot engage in honest toil to

earn his daily bread, without first purchasing a license or permit from some board or commission. The public health is entitled to consideration at the hands of the legislative department of the government, but it must be remembered that liberty does not occupy a secondary place in our fundamental law. Under some of the acts to which we have referred, members of the board of health form part of the examining board, but our act has not even this saving grace. By its terms two master plumbers and one journeyman plumber are constituted the guardians of the public health and welfare. We are not permitted to inquire into the motive of the legislature, and yet, why should a court blindly declare that the public health is involved, when all the rest of mankind know full well that the control of the plumbing business by the board and its licensees is the sole end in view. We are satisfied that the act has no such relation to the public health as will sustain it as a police or sanitary measure, and that its interference with the liberty of the citizen brings it in direct conflict with the constitution of the United States."

Notwithstanding that rather strong indictment of this sort of legislation, this court has since sustained a number of similar laws relating to other occupations, and the United States supreme court has, in *Bunting v. Oregon,* 243 U. S. 426, 37 Sup. Ct. 435, and perhaps in other cases, seemed to take a position at variance with its cases cited and relied upon in the *Richey* case.

The *Richey* case has not met with favor in other jurisdictions, having been followed, so far as we are advised, only by the supreme court of Arkansas. See *Replogle v. Little Rock,* 166 Ark. 617, 267 S. W. 353, 36 A. L. R. 1333.

The police power of the state (and of the municipalities within their limited jurisdiction, *Brennan v. Seattle,* 151 Wash. 665, 276 Pac. 886) not only extends to enactments designed to protect and promote public peace, health, morals and safety, but also to those in-

tended to promote the general public welfare and prosperity.

"Upon the common law maxim above quoted rests, as we have seen, what is termed the police power of the state, which, in its broadest acceptation, means the general power of the state to preserve and promote the public welfare, even at the expense of private rights." *Karasek v. Peier,* 22 Wash. 419, 61 Pac. 33, 50 L. R. A. 345.

"Having in mind the sovereignty of the state, it would be folly to define the term. To define is to limit that which from the nature of things cannot be limited, but which is rather to be adjusted to conditions touching the common welfare, when covered by legislative enactments. The police power is to the public what the law of necessity is to the individual. It is comprehended in the maxim *salus populi suprema lex.* It is not a rule, it is an evolution." *State v. Mountain Timber Co.,* 75 Wash. 581, 135 Pac. 645, L. R. A. 1917D 10.

In applying this rule, the courts do not act upon evidence as to what is and what is not so designed as to promote the public welfare, but, to the contrary, every such act is presumed to be in the interest of the public welfare if a state of facts might reasonably exist which would justify it.

"In determining whether the provisions of a law bring it within the police power, it is not necessary for the court to find that facts exist which would justify such legislation. If a state of facts can reasonably be presumed to exist which would justify the legislation, the court must presume that it did exist and that the law was passed for that reason. If no state of circumstances could exist to justify the statute, then it may be declared void because in excess of the legislative power." *State v. Pitney,* 79 Wash. 608, 140 Pac. 918, Ann. Cas. 1916A 209.

This principle seems to have been largely overlooked or disregarded in the Richey case and instead the court

there assumed that the purpose of the statute was monopolistic.

The other states of the union have uniformly sustained similar legislation. *Singer v. State,* 72 Md. 464, 19 Atl. 1044, 8 L. R. A. 551; *People ex rel. Nechamcus v. Warden,* 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718; *State ex rel. Winkler v. Benzenberg,* 101 Wis. 172, 76 N. W. 345; *State v. Gardner,* 58 Ohio St. 599, 51 N. E. 136, 65 Am. St. 785, 41 L. R. A. 689; *Caven v. Coleman,* 96 S. W. (Tex. Civ. App.) 774; *Beltz v. City of Pittsburgh,* 211 Pa. St. 561, 61 Atl. 78; *Douglas v. The People,* 225 Ill. 536, 80 N. E. 341, 116 Am. St. 162, 8 L. R. A. (N. S.) 1116; *Ex Parte Smith,* 231 Mo. 111, 132 S. W. 607; *Commonwealth v. Beaulieu,* 213 Mass. 138, 99 N. E. 955, Ann. Cas. 1913E 1080; *City of Louisville v. Coulter,* 177 Ky. 242, 197 S. W. 819, L. R. A. 1918A 811; *State ex rel. Grantham v. City of Memphis,* 151 Tenn. 1, 266 S. W. 1038; *State v. Foss,* 147 Minn. 281, 180 N. W. 104; *State v. Malory,* 168 La. 742, 123 South. 310. Some of these cases refer to the *Richey* case and expressly decline to follow it.

We think our own cases subsequent in time to the *Richey* case have, in effect, overruled it. *State v. Walker,* 48 Wash. 8, 92 Pac. 775, 15 Ann. Cas. 257, sustains a similar law having reference to barbers. True, the majority sought to distinguish that case from the *Richey* case upon the ground that the barber operates directly upon the person, but we doubt if an unskilled barber can do more real and lasting harm than an unskilled plumber. Diseases imparted by a barber are likely to be superficial and such as yield readily to treatment, while defective plumbing may cause an epidemic of disease in a thickly settled community threatening the lives of many. When the statute which the *Walker* case upholds is carefully read, we think that case, in logical effect, overrules the *Richey* case.

In *State v. Bowen & Co.*, 86 Wash. 23, 149 Pac. 330, Ann. Cas. 1917B 625, the statute requiring the licensing of commission merchants was upheld. The court there distinguished the *Richey* case on the theory that the board was so constituted as to render the act monopolistic, but, in its main features, the *Richey* case was there again, in effect, overruled by the following language:

"As a general proposition, the questions of the wisdom, necessity, and policy of the law are for the legislature to determine, and if the legislature proceeds regularly, violating no other constitutional restriction or prohibition, the questions of fact as to the wisdom, necessity, and policy of the law are conclusively determined if a state of facts could exist which would justify the legislation in question. . . .

"Every possible presumption is in favor of the validity of the statute until the contrary is shown beyond a reasonable doubt."

Again, in *Sherwood v. Wise*, 132 Wash. 295, 232 Pac. 309, 42 A. L. R. 1219, the *Richey* case was distinguished on the ground that a mere trade such as plumbing was in some manner different from a profession such as architecture, but, in this day and age, it is not for us to say that the legislative branch may not be as fully justified in dealing with one as with the other. Certainly, the journeyman plumber may be as dangerous to the public health and safety as the architect. In principle we think this case again overruled the *Richey* case.

In the early history of this sort of legislation, there was much fear that individual rights might be lost through such enactments, but, in the light of a quarter of a century or more of experience, we find that such fears have been largely removed, and if there be no arbitrary features in such an act, it is now usually unhesitatingly sustained by the courts.

Unless we now repudiate the doctrine quoted from the *Pitney* and *Bowen* cases, *supra,* there is nothing left but to overrule in terms the *Richey* case. Feeling satisfied that we are only publicly acknowledging that which we have heretofore done indirectly, we now formally overrule *State ex rel. Richey v. Smith.*

From what we have said, it logically follows that the trial court, through no fault of his, but because of our failure to formally overrule the *Richey* case heretofore, erred in sustaining the demurrer to the complaints.

The judgment is reversed and the cause remanded with directions to overrule the demurrer and proceed to trial.

MITCHELL, C. J., MILLARD, PARKER, and BEALS, JJ., concur.